*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. A. LEDEE, Minor.

FOR PUBLICATION
March 23, 2026
2:06 PM

No. 371631
Wayne Circuit Court
Family Division
LC No. 2017-001407-NA

Before: RIORDAN, P.J., and MURRAY and MALDONADO, JJ.

MALDONADO, J.

Respondent appeals by right the order terminating her parental rights to the minor child, LAL, under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury to a sibling, and there is a reasonable likelihood that the child will be injured if returned to the parent), (i) (parental rights to a sibling were terminated due to serious physical abuse and the parent failed to rectify the conditions that led to the prior termination), and (j) (reasonable likelihood that the child will be harmed if returned to the home of the parent). We affirm.

## I. BACKGROUND

Respondent is the biological mother of three children: ZJF, ABIM, and LAL. In August 2017, ZJF and ABIM were removed from respondent's care because of concerns about respondent's "history of substance abuse and domestic violence." Respondent's parental rights were later terminated in October 2019, because of her failure to comply with a treatment plan.

LAL was born in March 2021, and respondent was permitted to take him home from the hospital, despite the prior terminations. When ABIM and LAL's father went to prison, ABIM came to be in respondent's care, even though respondent's parental rights to ABIM had been terminated. In September 2022, ABIM reported that respondent had physically abused her.

In October 2022, following ABIM's disclosure, she was sent to forensic interviewer Elisabeth Mallory. At the interview, ABIM said that respondent took pills in front of her and that respondent had a very different personality afterward. ABIM revealed that respondent dragged her by the hair to take hot baths, that she received a large cut after respondent dragged her across

-1-

a nail that was sticking out of the baseboard, that she received a chipped tooth and a black eye after respondent hit her head on the side of the bathtub, and that respondent instructed her to lie if she was asked about how she got the black eye. ABIM was also physically examined at the Children's Hospital of Michigan, and a physician concluded that her injuries were consistent with physical abuse.

Petitioner, the Department of Health and Human Services (DHHS), filed a petition to terminate respondent's parental rights to LAL at the initial disposition. At the preliminary hearing, the family court referee asked respondent whether she was enrolled or eligible for enrollment with a Native American tribe, and respondent replied that she was a member of the Lumbee Tribe of North Carolina. The DHHS did not provide notice to the Lumbee Tribe and instead sent a notification to the Bureau of Indian Affairs (BIA) because—at the time of the proceedings in this case—the Lumbee Tribe was not a federally-recognized Indian tribe as defined by the Michigan's Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*, and the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*[1] In its order following the preliminary hearing, the trial court determined that because the Lumbee Tribe was not a federally-recognized tribe, the DHHS properly submitted notices to the BIA.

Before trial, the DHHS moved the court to admit ABIM's statements to Mallory in the forensic interview under MCR 3.972(C)(2) and MRE 803(24). At a hearing on the motion, Mallory testified about her qualifications to conduct the interview, her procedures for conducting forensic interviews, and the substance of what ABIM told her during the interview. After viewing a recording of the interview, the referee held that the circumstances of the interview indicated that the statements were trustworthy and admitted Mallory's testimony about ABIM's disclosures during the forensic interview.

After LAL's father's paternity was established through DNA testing in July 2023, the DHHS filed an amended petition that still requested termination of respondent's parental rights, but also requested that LAL's father be required to follow a treatment plan with the goal of reunification. The trial court authorized the amended petition.

The referee conducted a combined adjudication and termination hearing as to respondent's parental rights over three days in February, March, and May 2024. At the beginning of the hearing, the DHHS moved for the admission of Mallory's prior testimony regarding the forensic interview of ABIM, and the referee admitted the testimony without objection from respondent. Next, the DHHS called Thirl Hudson, the CPS specialist assigned to the case. Hudson testified that, on the basis of his investigation, he was concerned with respondent's substance abuse and physical

---

[1] This Court takes judicial notice that on December 18, 2025, Congress passed the *National Defense Authorization Act for Fiscal Year 2026*, which included the *Lumbee Fairness Act*. PL 119-60, § 8803. The *Lumbee Fairness Act* specifically states that "Federal recognition is extended to the Lumbee Tribe of North Carolina." PL 119-60, § 8803, Sec. 4. However, recognition occurred after the close of the termination proceedings and does not impact our analysis of the issues in this case. We note, though, that the *Lumbee Fairness Act* may impact future proceedings in this case.

violence, and he believed that it was in LAL's best interests to terminate respondent's parental rights. The referee admitted ABIM's medical records, evidence of respondent's prior terminations, and respondent's clinical evaluation into evidence. On cross-examination, Hudson admitted that he never saw any signs that LAL was being abused or that respondent was not caring for him appropriately.

On the second day of the hearing, the referee heard the testimony of Ashleigh Miller, a foster-care supervisor. Miller described a recent change in LAL's placement wherein he was removed from his grandmother's care and placed in an unrelated foster home because of "ongoing safety concerns." Specifically, LAL's grandmother was allowing respondent to have consistent, unsupervised overnight visitation with LAL, which was not permitted by the court's orders. The grandmother also said that she believed that respondent was abusing drugs, but the grandmother was allowing unsupervised visitation because respondent was "blackmailing" her. Miller also testified that respondent's text messages to her and other caseworkers suggested that she "continues to [display] no impulse control, aggressive and inappropriate reaction[s] to situations and emotional outburst[s]."

On the final day of the hearing, respondent testified. She said that she never hurt ABIM. Respondent also said that she did not intend to violate the court's orders regarding visitation, and she only had LAL alone because she thought that she was permitted to do so. On cross-examination, respondent was questioned about an unknown prescription pill that was found in a bag that she gave LAL at a supervised visitation. Respondent denied knowledge of the pill and implied that the pill may have been left in the room from a prior visitation and somehow ended up in LAL's bag, but she admitted that there was now a safety plan in place for her visits with LAL. Finally, Taneisha Craig, a foster-care supervisor, testified that there was a bond between respondent and LAL and that LAL cried at the end of his visits with respondent.

After the close of evidence and the parties' arguments, the referee found that there was a statutory basis for the court to take jurisdiction. The referee additionally found that there was clear and convincing evidence that the statutory grounds for termination were present, specifically MCL 712A.19b(3)(b)(*i*), (i), and (j). Of key importance to the referee was the testimony of the physical abuse inflicted by respondent, which was corroborated by ABIM's medical records. The referee also determined that respondent's parental rights to ABIM were terminated, and that the issues that led to her termination, specifically substance abuse and her emotional instability, had not been addressed. Finally, the referee found that there was a reasonable likelihood, on the basis of respondent's prior history, that LAL would be harmed if returned to her home. The referee then concluded that termination of respondent's parental rights was in LAL's best interests. The trial court adopted these findings in its written termination order. This appeal followed.

## II. ICWA AND MIFPA

Respondent first argues that the trial court's termination order must be conditionally reversed because the court erred when it wrongfully denied respondent the statutory rights and protections of MIFPA and ICWA. We disagree.

## A. STANDARDS OF REVIEW

We review "de novo the interpretation and application of statutes and court rules." *In re Ott*, 344 Mich App 723, 735; 2 NW3d 120 (2022). This includes the interpretation and application of ICWA and MIFPA. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 462-463; 861 NW2d 303 (2014). Additionally, we review "for clear error the trial court's findings of fact underlying the legal issues." *Id*. at 463. A finding is clearly erroneous if we are "definitely and firmly convinced that the trial court made a mistake." *Id*.

## B. PRESERVATION

In the present case, counsel for the DHHS stated at the preliminary hearing that the agency sent notice of the proceedings to the BIA because the Lumbee Tribe was not a federally-recognized tribe. The notice sent to the BIA was admitted into evidence, and respondent did not raise any objection to either its admission or its sufficiency under ICWA or MIFPA. Consequently, under the customary rules of appellate review, the issue would be unpreserved.

However, Section 1914 of ICWA and Section 39 of MIFPA authorize collateral attacks on terminations conducted in violation of ICWA and MIFPA's notice requirements in a subsequent proceeding. 25 USC 1914; MCL 712B.39. Consequently, courts in other states have concluded that ICWA objections may be raised for the first time on appeal. See, e.g., *Dep't of Human Servs v JG*, 260 Or App 500, 502; 317 P3d 936 (2014) (concluding that, in light of Section 1914, ICWA arguments are "reviewable despite not being preserved"); *In re KR*, 20 Cal App 5th 701, 706; 229 Cal Rptr 3d 451 (2018) (holding that the failure to object in the trial court to deficiencies in the ICWA notice does not preclude parents from raising ICWA for the first time on appeal); *Interest of MTR*, 579 SW3d 548, 571 (Tex App, 2019) (holding that because ICWA preempts state waiver principles, "[a] complaint alleging a failure to follow the ICWA may be raised for the first time on appeal"). Unpublished opinions of this Court have come to opposite conclusions as to whether the traditional preservation requirements apply to ICWA objections. Compare *In re Janes*, unpublished per curiam opinion of the Court of Appeals, issued October 14, 2003 (Docket No. 247456), p 5 ("Because notice provisions under the ICWA are mandatory, issues regarding compliance may be raised for the first time on appeal."), with *In re Vermiglio-Carter*, unpublished per curiam opinion of the Court of Appeals, issued April 12, 2018 (Docket No. 340047), p 2 ("However, because respondent did not argue below that the ICWA notice requirements were not met, this issue is unpreserved.").

Because we find the caselaw determining that Section 1914 dispenses with traditional state law preservation requirements persuasive, we apply the standards of review applicable to preserved ICWA and MIFPA arguments.

## C. LEGAL FRAMEWORK

Congress enacted ICWA in 1978 to protect and preserve Indian families in response to growing concerns over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster-care placement, usually in non-Indian homes." *In re Morris*, 491 Mich 81, 97; 815 NW2d 62 (2012)

(quotation marks and citation omitted). Consequently, when an Indian child is involved in the adjudication of a custody proceeding, which is broadly defined to include foster-care placements, adoptions, terminations of parental rights, and certain guardianship and juvenile justice proceedings, "ICWA governs from start to finish." *Haaland v Brackeen*, 599 US 255, 266; 143 S Ct 1609; 216 L Ed 2d 254 (2023). See also 25 USC 1903(1).

If the child qualifies as an Indian child under ICWA, certain additional notice requirements are applicable:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster[-] care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster[-]care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary . . . . [25 USC 1912(a).]

Likewise, if ICWA applies to a termination proceeding because an Indian child is involved, the law imposes many additional substantive and procedural requirements designed to preserve the integrity and stability of the tribal family unit. For example, the party seeking to terminate parental rights or remove an Indian child from an unsafe environment must first "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 USC 1912(d).

Under ICWA, an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . . ." 25 USC 1903(4). Importantly, an "Indian tribe" is defined as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians . . . ." 25 USC 1903(8). These services, offered through the BIA, underscore the distinctive and longstanding trust responsibility that the federal government has undertaken with respect to Indian tribes. See *Cherokee Nation v State of Georgia*, 5 Pet 1; 8 LEd 25 (1831). See also *Oneida Cnty, NY v Oneida Indian Nation of New York State*, 470 US 226, 247; 105 S Ct 1245; 84 L Ed 2d 169 (1985).

Additionally, our Legislature adopted MIFPA in 2012 to "establish state law standards for child welfare and adoption proceedings involving Indian children." *In re Williams*, 501 Mich 289, 298; 915 NW2d 328 (2018). Although MIFPA echoes many of the substantive and procedural requirements of ICWA, some of the standards established by MIFPA "provide greater protections for Indian families than those provided by ICWA." *Id*. Some of MIFPA's procedural and substantive requirements applicable to termination proceedings include:

(1) the state must give notice of the pending proceeding to the Indian tribe; (2) before removal or to continue removal, the state must prove by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child; (3) when seeking termination, the state must demonstrate that active efforts were made to prevent the breakup of the Indian family and that the efforts were unsuccessful; and (4) any termination of parental rights must be supported by evidence beyond a reasonable doubt and by the testimony of at least one qualified expert who knows about the child-rearing practices of the Indian child's tribe. [*Id*. at 301-302.]

Similar to ICWA, an "Indian child" under MIFPA is "an unmarried person who is under the age of 18 and is either of the following: (*i*) A member of an Indian tribe [or] (*ii*) Eligible for membership in an Indian tribe as determined by that Indian tribe." MCL 712B.3(k). Likewise, an "Indian tribe" is defined as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the [Secretary of the Interior] because of their status as Indians . . . ." MCL 712B.3(o).

Our Supreme Court has held that "the proper remedy for ICWA-notice violations is to conditionally reverse the trial court and remand for resolution of the ICWA-notice issue." *Morris*, 491 Mich at 122. However, "ICWA does not apply to a termination case when the minor child is claimed to be an Indian child from an Indian tribe that is not recognized as eligible for services provided to Indians by the Secretary of the Interior." *In re Fried*, 266 Mich App 535, 536; 702 NW2d 192 (2005). "While it is for the tribe to determine whether a child is an 'Indian child,' it is for the court to determine whether the tribe is an 'Indian tribe.' " *Id*. at 540.

D. ANALYSIS

In the instant case, respondent notified the court at the preliminary hearing that she was a member of the Lumbee Tribe of North Carolina. Accordingly, we must determine whether respondent's membership in the Lumbee Tribe triggered the protections of either ICWA or MIFPA during the pendency of the proceedings.

The law in effect at all times relevant to these proceedings was *An Act Relating to the Lumbee Indians of North Carolina*, also known as the Lumbee Act, which was passed in 1956. The Lumbee Act designated "the Indians now residing in Robeson and adjoining counties of North Carolina . . . claiming joint descent from remnants of early American colonists and certain tribes of Indians originally inhabiting the coastal regions of North Carolina," as "Lumbee Indians." PL 84-570, § 375; 70 Stat 255. However, the Lumbee Act also expressly provided that

[n]othing in this Act shall make any such Indians eligible for any services performed by the United States for Indians because of their status as Indians, and none of the statutes of the United States which affect Indians because of their status as Indians shall be applicable to the Lumbee Indians. [*Id*.]

-6-

The plain language of the governing statutes and the record make clear that the Lumbee Tribe was not an "Indian tribe" for purposes of either ICWA or MIFPA at the time of the respondent's termination proceedings. The record contains no evidence that the Lumbee Tribe was recognized as eligible for services and benefits provided to members of federally-recognized tribes; accordingly, the trial court correctly concluded that the Lumbee Tribe did not satisfy the definition of an "Indian tribe" under 25 USC 1903(8) or MCL 712B.3(o).

For the same reason, the trial court properly concluded that LAL was not an "Indian child" within the meanings of ICWA or MIFPA. Because ICWA does not apply when a child is claimed to be a member of a tribe that is not recognized as eligible for services from the Secretary of the Interior, the court did not err in declining to apply the statutory requirements of ICWA or MIFPA in the termination proceedings. See *Fried*, 266 Mich App at 536. Accordingly, respondent has not demonstrated that she is entitled to relief on this basis.

The fact that the Lumbee Tribe gained federal recognition while respondent's appeal was pending does not require a different result. As stated, the plain language of ICWA's notice provisions indicates that notice is required in instances when a party is "seeking the foster care placement of, or termination of parental rights to, an Indian child . . . ." 25 USC 1912(a). At this point, no party is seeking foster care or termination of parental rights; respondent's parental rights have already been terminated. Moreover, MIFPA makes clear that if the family division of circuit court or the probate court discovers that a child is a member of an Indian Tribe, "all *further proceedings* shall be suspended until notice is received by the tribe." MCL 712B.9(2) (emphasis added). In this case, there will be further proceedings regarding the children's father. Now that the Lumbee Tribe is federally recognized, the law requires that those proceedings be suspended until the Tribe receives notice. The law does not require this Court to undo the termination of respondent's parental rights.

### III. STATUTORY BASIS FOR TERMINATION

Next, respondent argues that the trial court erred when it found a statutory basis to terminate respondent's parental rights. We disagree.

### A. STANDARDS OF REVIEW AND LEGAL FRAMEWORK

"We review the trial court's determination of statutory grounds for clear error." *In re Sanborn*, 337 Mich App 252, 272; 976 NW2d 44 (2021). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 272-273 (quotation marks and citation omitted). "We review de novo the interpretation and application of statutes and court rules." *Ott*, 344 Mich App at 735.

In the instant case, the trial court found that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(b)(*i*), (i), and (j). Under MCL 712A.19b(3)(b)(*i*), the court may terminate a parent's parental rights if it finds, by clear and convincing evidence, that the child or a sibling of the child has suffered physical injury or abuse, that the parent's act caused the physical injury or abuse, and that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home. Under MCL

712A.19b(3)(i), the court may terminate a parent's parental rights if "[p]arental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights." Finally, under MCL 712A19b(3)(j), termination is warranted if the court determines that there is a "reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent."

To terminate a parent's parental rights, "the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). However, only one statutory ground for termination needs to be established, and termination is proper on that basis "even if the court erroneously found sufficient evidence under other statutory grounds." *Id*.

## B. ANALYSIS

The first statutory ground for termination that the trial court found was met was MCL 712A.19b(3)(b)(*i*), which required the court to find, by clear and convincing evidence, that (1) ABIM, as LAL's sibling, suffered physical injury, (2) respondent caused the physical injury, and (3) there is a reasonable likelihood that LAL would suffer from injury or abuse if placed in respondent's home.

Respondent argues that "[t]here was no legally admissible evidence of injury to any child," but a review of the record reveals that this simply is not true. ABIM's certified medical records were admitted into evidence on the first day of the termination hearing without objection from respondent. The records indicate that a physician performed an examination for physical abuse, noting that ABIM had "3 healed scars on the right knee and a small healed scar on the right lateral ankle," as well as a "chipped tooth . . . ." The physician included a differential diagnosis of "physical abuse of a child."

Further, the court admitted Mallory's prior testimony regarding her forensic interview of ABIM under MCR 3.972(C)(2) as substantive evidence at the hearing. Under this provision,

> Any statement made by a child under 10 years of age or an incapacitated individual under 18 years of age with a developmental disability, as defined in MCL 330.1100a(27), regarding an act of child abuse, child neglect, confirmed sexual abuse, or confirmed sexual exploitation, as defined in MCL 722.622(g), (k), (q), or (r), performed with or on the child by another person may be admitted into evidence through the testimony of a person who heard the child make the statement as provided in this subrule.

> (a) A statement describing such conduct may be admitted regardless of whether the child is available to testify or not, and is substantive evidence of the act or omission if the court has found, in a hearing held before trial, that the circumstances surrounding the giving of the statement provide adequate indicia of trustworthiness. This statement may be received by the court in lieu of or in addition to the child's testimony.

MCR 3.972 works in tandem with MCL 712A.17b(5), which provides that videorecorded statements made by witnesses under the age of 16 in a forensic interview "shall be admitted at all proceedings *except the adjudication stage instead* of the live testimony of the witness." *In re Martin*, 316 Mich App 73, 81; 896 NW2d 452 (2016), quoting MCL 712A.17b(5). Consequently, this Court has explained that

> a videorecorded statement taken in compliance with MCL 712A.17b must be admitted at a tender-years hearing and can be used by the trial court to assess whether a proposed witness who took the videorecorded statement should be permitted to testify at trial about the statement, i.e., to assess whether "the circumstances surrounding the giving of the statement provide[d] adequate indicia of trustworthiness." [*Martin*, 316 Mich App at 83, quoting MCR 3.972(C)(2)(a).]

In the instant case, before admitting Mallory's testimony at trial, the referee conducted a "tender-years hearing" over several days to determine whether the "circumstances surrounding the giving of the statement provide adequate indicia of trustworthiness" under MCR 3.972. At the hearing, the referee heard Mallory's testimony about the forensic interview protocol that she employed, her qualifications for performing the interview, and ABIM's substantive claims of abuse made during Mallory's interview. Respondent's counsel cross-examined Mallory at the hearing. Finally, the referee viewed the videorecording of the forensic interview. At the conclusion of the hearing, the referee determined that there was "adequate indicia of trustworthiness as it relates to these statements," and received Mallory's statements in lieu of or in addition to ABIM's testimony at the termination hearing. The referee also told respondent, however, that "you can always call the young lady as a witness 'cause [sic] the court rule says— or I don't think it prevents you or bars you from doing that.' "

At the termination hearing, petitioner moved for the admission of Mallory's prior testimony as substantive evidence because "the testimony of Ms. Mallory would be the same now as it was during that hearing." Respondent did not object to the admission of this prior testimony, and the referee incorporated the testimony as substantive evidence at the termination hearing. Respondent did not call either Mallory or ABIM as witnesses at the termination hearing. On appeal, respondent does not challenge the admission of Mallory's prior testimony, and so the issue is not before us.

As to the substance of Mallory's testimony, Mallory testified that ABIM told her that "my mom has been hurting me," and then went on to describe different times respondent had injured her. Based on this testimony and the corroborating medical records, the admission of which respondent did not challenge in the trial court or in her appeal to this Court, there was ample evidence in the record to establish that ABIM was physically abused and that respondent was the one who abused her.

The record also supports the trial court's determination that there was a reasonable likelihood that LAL would be harmed if returned to respondent's care. Under the doctrine of anticipatory neglect, we recognize that "how a parent treats one child is probative of how that parent may treat other children." *In re Mota*, 334 Mich App 300, 323; 964 NW2d 881 (2020). Consequently, evidence of respondent's abuse of ABIM is probative of how respondent may treat LAL. Additionally, ABIM said that respondent "would hit [LAL] really hard, but that he was wearing a diaper when she did it." Consequently, the record supports the trial court's finding, by

clear and convincing evidence, that there was a reasonable likelihood that LAL will suffer from injury or abuse in respondent's care.

Therefore, we are not left with a definite and firm conviction that the trial court erred by adopting the referee's determination that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(b)(*i*).[2]

## IV. BEST INTERESTS

Finally, respondent argues that the court erred when it determined that the termination of her parental rights was in LAL's best interests. Again, we disagree.

This Court "review[s] for clear error the trial court's determination of best interests." *Sanborn*, 337 Mich App at 276. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted). "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *Id*. (quotation marks and citation omitted).

Before a trial court may terminate parental rights, the court is required to find by a preponderance of the evidence that termination is in the child's best interests. *Id*. "Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). However, "the focus at the best-interest stage has always been on the child, not the parent." *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013).

"In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *Sanborn*, 337 Mich App at 276 (quotation marks and citation omitted). A number of factors may be relevant to the court's best-interest determination, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citations omitted). The court "may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

A child's safety and well-being, and the risk that a child might face if returned to the parent's care, must also be considered in the court's best-interest determination. See *In re VanDalen*, 293 Mich App 120, 141-142; 809 NW2d 412 (2011). To assess the risk of future harm if returned to the parent's care, the court may consider the doctrine of anticipatory neglect, in which

---

[2] "Because only one statutory ground for termination of a respondent's parental rights need be established, . . . we need not address whether termination was also warranted under" other statutory provisions. *In re Atchley*, 341 Mich App 332, 346 n 6; 990 NW2d 685 (2022) (citation omitted).

the parent's treatment of one child is probative of how they will treat another. *Mota*, 334 Mich App at 323.

In the instant case, the trial court heard evidence at the termination hearing that weighed for and against termination. Multiple witnesses attested to the strong bond between respondent and LAL. Respondent testified that she loves her son and that he was happy to see her during visitation. She also said that she loves LAL "more than anything," and she would comply with any conditions set by the court in order to get him back. Foster-care supervisor Craig also testified that there was a bond between respondent and LAL, noting, "I observed [respondent] engaging with [LAL]. I saw [LAL] engage with her. At the end of the visit, [respondent] cried. [LAL] cried. Both of them cried at the end and that was [how] I can draw a conclusion there was some sort of bond." Craig further noted that respondent would play with LAL and bring him gifts during their visits, and she would hold him and console him when it was time to leave. The referee appropriately concluded, on the basis of this evidence, that there was a bond between the two.

However, the referee also heard evidence that respondent lacks the ability to parent LAL appropriately. Foster-case supervisor Miller testified that when LAL came into the DHHS's care at age two, he required approximately 14 fillings and crowns. And even after the foster-care workers advised respondent of the importance of healthy foods, given her son's dental problems, respondent continued to bring him sugary snacks like cookies and iced tea. Of greater concern, in November 2023, after LAL was removed from respondent's care, there was another CPS referral alleging that LAL had a handprint mark on his body. Although the workers had a strong suspicion that the handprint was caused by respondent, they were unable to substantiate their suspicion because, at the time, respondent was not permitted to have unsupervised access to LAL. They later learned that respondent did have unsupervised access to LAL. In light of this and the other evidence, the referee appropriately concluded that respondent still lacks the ability to parent LAL.

The referee also weighed evidence of physical abuse of LAL's sibling, ABIM. Respondent's parental rights to her two older children were terminated due to her history of substance abuse and domestic violence, and her failure to adhere to a treatment plan. Even after ABIM was removed from respondent's care and her parental rights to ABIM were terminated, respondent physically abused ABIM. ABIM also reported that she saw respondent hit LAL "really hard." The referee appropriately concluded that the evidence of respondent's abuse of ABIM weighed in favor of termination.

The referee also acknowledged that, although respondent had a consistent visitation history with LAL, she acted inappropriately during those visits. Specifically, she asked LAL questions such as "will you be with me forever," and "why don't you love me," which led to LAL becoming confused and dysregulated during the visits. After these visits, LAL's foster parent reported that he would regress on his toilet training, and he would become clingy and ask when he would have to go back to the visits. The referee also referred to respondent's aggressive and threatening behavior to the foster-care workers involved in her son's case as evidence of her poor impulse control.

As to permanency, stability, and finality, the referee noted that the plan for LAL was reunification with his father once he demonstrates that he can care for LAL by successfully

completing his treatment plan. However, in the meantime, LAL was doing well in a foster placement where he was not exposed to respondent's violence and instability.

After weighing these factors, the referee concluded that termination of respondent's parental rights was in LAL's best interests. Although the existence of a bond between respondent and LAL weighed against termination, many of the other factors the referee considered, such as respondent's parenting ability, respondent's abuse of ABIM, and respondent's emotional instability in her visits with LAL and in her interactions with caseworkers, weighed in favor of termination. Accordingly, respondent has not demonstrated that the trial court clearly erred when it adopted the referee's determination that it was in LAL's best interests to terminate her parental rights.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Christopher M. Murray